IN THE
# ARIZONA COURT OF APPEALS
DIVISION TWO

———————————————

ARIZONA PRESERVATION FOUNDATION AND
TUCSON HISTORIC PRESERVATION FOUNDATION,
*Petitioner*s,

*v.*

PIMA COMMUNITY COLLEGE DISTRICT BOARD,
*Respondent.*

No. 2 CA-SA 2025-0001
Filed April 3, 2025

———————————————

Special Action Proceeding
Pima County Cause No. C20247291
The Honorable Brenden J. Griffin, Judge

**JURISDICTION ACCEPTED; RELIEF DENIED**

———————————————

COUNSEL

Zwillinger Wulkan PLC, Phoenix
By Benjamin L. Rundall, Samantha T. Lee, and Lauren Whittaker
*Counsel for Petitioners*

Gust Rosenfeld P.L.C., Phoenix
By Robert D. Haws, Susan P. Segal, and Charles W. Wirken
*Counsel for Respondent*

Snell & Wilmer L.L.P., Phoenix
By Edward J. Hermes and Amanda Z. Weaver
*Counsel for Amicus Curiae the National Trust for Historic Preservation in the
United States*

---

**OPINION**

---

Presiding Judge Eckerstrom authored the opinion of the Court, in which Judge Vásquez and Judge Sklar concurred.

---

E C K E R S T R O M, Presiding Judge:

**¶1**　　　　In this special action, Arizona Preservation Foundation and Tucson Historic Preservation Foundation ("Petitioners") seek review of the superior court's denials of a stay pending the appeal of its denial of a preliminary injunction to prevent the Pima Community College District Board ("PCC") from demolishing three roadside hotels: the Tucson Inn, the Copper Cactus Inn (formerly the El Rancho Motor Hotel), and the Frontier Motel, all built between 1948 and 1958 (collectively, the "Drachman Hotels"). The three hotels are located within Tucson's Miracle Mile Historic District, which has been formally listed on the National Register of Historic Places since 2017, as well as the Arizona Register of Historic Places.

**¶2**　　　　Petitioners urge that PCC, a political subdivision, is bound by Arizona's historic preservation laws, A.R.S. §§ 41-861 through 41-864, such that it must consult with the State Historic Preservation Officer ("SHPO") before demolishing the Drachman Hotels. Petitioners request that we accept special-action jurisdiction, vacate the superior court's orders denying a stay pending appeal, and remand the matter with instructions for the court to enter a stay, "thereby restraining the demolition of the Drachman Hotels until such time as this Court may consider [Petitioners'] appeal of the superior court's denial of a preliminary injunction."

**¶3**　　　　PCC counters, *inter alia*, that the historic preservation statutes in question apply only to state agencies, which do not include political subdivisions like PCC. Notably, as discussed below, this interpretation appears to conform with the interpretation adopted by the SHPO itself. *See* ¶ 33, *infra*. For the reasons that follow, we conclude that the superior court correctly reached the same conclusion, ruling that the historic preservation statutes in question do not apply to PCC. We thus conclude that the court did not abuse its discretion in denying Petitioners' requests for a stay pending appeal. Therefore, although we accept special-action jurisdiction, we deny relief.

**Factual and Procedural Background**

¶4        Between 2018 and 2019, PCC purchased the Drachman Hotels for over $3.5 million.  In 2021, PCC approved planning for a campus development project, including the possible conversion of the hotels into student housing.  PCC proceeded to consider development options and, in mid-2024, authorized a request for qualifications to identify potential private sector developers.  PCC authorized one such developer to submit a proposal.  That proposal, submitted in August 2024, envisioned restoration of the hotels.  But, in November 2024, PCC voted not to proceed with the proposal and to end the process of requesting additional proposals.  Two days later, on November 20, PCC voted unanimously to demolish the Drachman Hotels and to move forward with destruction expeditiously.  At no point did PCC consult with the SHPO, nor did Petitioners contact the SHPO regarding their concerns.

¶5        On December 4, 2024, Petitioners filed a complaint in the superior court in Pima County, asserting a violation of §§ 41-861 through 41-864.  They sought preliminary and permanent injunctive relief enjoining PCC from demolishing the Drachman Hotels, declaratory relief confirming that political subdivisions like PCC are bound by Arizona's historic preservation laws, and attorney fees and costs under the Arizona Private Attorney General Doctrine.  Petitioners simultaneously filed an expedited request for a preliminary injunction and temporary restraining order ("TRO") without notice.

¶6        The next day, the superior court held a hearing on the expedited request.  The court granted the TRO, restraining PCC from proceeding with demolition but allowing it to continue abatement efforts.  The court ordered Petitioners to post a $25,000 bond.

¶7        On December 19, the superior court held oral argument on Petitioners' expedited request for a preliminary injunction.  After hearing from the parties, it denied the injunction, explaining:

> I think the plaintiffs are asking me to read too much into the statute.  I think the wording of the statute applies to state agencies.  It's clear to me that Pima County is a political subdivision.  The statutes that we're dealing with and that we've talked about use those two phrases, "political subdivision" and "state agency."  In my mind,

3

> that means that those two have different meanings, and one does not mean the same as the other. And so, for purposes of this statute, a state agency is something different than a political subdivision.
>
> I do think the statutory scheme says that the drafters of the statute hoped there would be cooperation between state agencies and those other entities but that it doesn't apply to them.

The court declined to address the issues of standing and whether the relevant historic preservation statutes contain an enforcement mechanism. This ruling was finalized in a minute entry filed December 20, in which the court denied the requested injunction but temporarily extended the TRO to allow Petitioners to seek a stay from this court. Petitioners filed a notice of appeal from the December 20 minute entry order. That appeal remains pending.

¶8　　　On December 26, Petitioners filed with the superior court a request for a stay pending appeal under Rule 7(c), Ariz. R. Civ. App. P., arguing that they had already provided security in the form of the $25,000 bond and that demolition of the Drachman Hotels would moot the action. PCC opposed. On December 27, the court denied the stay pending appeal but extended the TRO until December 31 to allow Petitioners to seek relief from this court.[1] They have done so in this special action. We granted a stay of the superior court's order removing the TRO to allow us to consider whether the court erred in denying a stay pending appeal.

### Jurisdiction

¶9　　　Special-action jurisdiction is appropriate where "the remedy by appeal is not equally plain, speedy, and adequate." Ariz. R. P. Spec. Act. 2(b)(2). The exercise of special-action jurisdiction "is appropriate in matters of statewide importance, issues of first impression, cases involving purely legal questions, or issues that are likely to arise again." *State ex rel. Romley*

---

[1] On December 30, Petitioners filed a second request for a stay pending appeal under Ariz. R. Civ. App. P. 7(c). PCC again opposed. On December 31, the superior court temporarily granted the stay pending appeal, but only until January 6, 2025.

*v. Martin*, 203 Ariz. 46, ¶ 4 (App. 2002). "Our decision to accept jurisdiction of a special action is highly discretionary." *League of Ariz. Cities & Towns v. Martin*, 219 Ariz. 556, ¶ 4 (2009).

¶10 Petitioners' entitlement to a stay pending appeal turns in part on whether they can demonstrate a likelihood of success on the merits of their claim that §§ 41-861 through 41-864 apply to political subdivisions of the state. That purely legal question has never been addressed by judicial decision. It is also a matter of state-wide significance and public interest, as it concerns the historic preservation responsibilities of all political subdivisions in the state. "Additionally, when, as here, the special action presents a pure question of law, it is particularly appropriate for us to accept jurisdiction." *Sw. Gas Corp. v. Irwin*, 229 Ariz. 198, ¶ 7 (App. 2012). We therefore exercise our discretion and accept special-action jurisdiction.

**Discussion**

¶11 Petitioners contend the superior court abused its discretion in denying a stay pending appeal. We review a lower court's stay determination for an abuse of discretion, *see Apache Produce Imps., LLC v. Malena Produce, Inc.*, 247 Ariz. 160, ¶ 9 (App. 2019), reviewing underlying statutory interpretation issues de novo, *TP Racing, L.L.L.P. v. Simms*, 232 Ariz. 489, ¶ 8 (App. 2013).

¶12 As in the context of preliminary injunctions, Arizona courts determining the propriety of a stay pending appeal consider four factors: (1) whether the requesting party has a strong likelihood of success on the merits; (2) whether irreparable harm will result if the stay is not granted; (3) whether the harm to the requesting party outweighs the harm to the opposing party; and (4) whether public policy favors granting the stay. *Smith v. Ariz. Citizens Clean Elections Comm'n*, 212 Ariz. 407, ¶¶ 9-10 (2006). The party requesting the stay bears the burden of establishing these elements. *See id.* ¶ 10.

¶13 Here, the questions of the likelihood of success on the merits and irreparable harm both pivot on whether the historic preservation statutes invoked by Petitioners apply to PCC. Those questions are also informed by the separate issue of whether Petitioners have standing to assert any claim for a violation of the historic preservation statutes. At oral argument, PCC conceded that the record is not sufficiently developed for a determination of Petitioners' standing. We thus leave the standing issue to

the superior court and do not address it further, focusing exclusively on whether §§ 41-861 through 41-864 apply to PCC.

**¶14** The parties agree that PCC is a political subdivision of the state of Arizona. *See, e.g.*, A.R.S. §§ 15-1401(7), 16-204(H), 16-204.01(D)(1), 34-321(E)(3), 35-326(E), 35-468(2), 35-511(2), 42-17001(3); *see also McClanahan v. Cochise Coll.*, 25 Ariz. App. 13, 17 (1975) ("[A] community college district is a political subdivision of the state."). The historic preservation statutes in question refer only to "state agencies" and the properties owned and controlled by them. §§ 41-861, 41-862; *see also* §§ 41-863, 41-864. They set forth "agency responsibilities" for historic preservation, § 41-861, establish requirements for SHPO "review of agency plans," § 41-864, and require reporting on "the performance of state agencies" in satisfying their historical preservation responsibilities, § 41-862.

**¶15** Petitioners contend these statutes apply to political subdivisions and, thus, to PCC. PCC argues they do not, and—in denying the preliminary injunction—the superior court agreed. We now turn to that pure question of statutory interpretation.

**¶16** "If a statute's language is clear and unambiguous, we apply it without resorting to other methods of statutory interpretation." *Hayes v. Cont'l Ins. Co.*, 178 Ariz. 264, 268 (1994). Where more than one rational interpretation is possible, courts resolve that ambiguity by considering the statute's subject matter and context, the spirit and purpose conveyed by the language, and, if necessary, relevant legislative history. *Id.*; *State ex rel. Ariz. Dep't of Revenue v. Tunkey*, 254 Ariz. 432, ¶¶ 27, 32 (2023) (Bolick, J., concurring) (consideration of legislative history permissible as "*secondary interpretative device*," but courts must choose "plain meaning over legislative intent when the two diverge").

**¶17** In determining whether statutory text is clear and unambiguous, "[w]ords should be construed in their overall statutory context." *Rosas v. Ariz. Dep't of Econ. Sec.*, 249 Ariz. 26, ¶ 13 (2020). "When statutes relate to the 'same subject or general purpose,' we read them together." *PNC Bank, N.A. v. Coury*, 257 Ariz. 25, ¶ 8 (App. 2024) (quoting *Stambaugh v. Killian*, 242 Ariz. 508, ¶ 7 (2017)). We must, if possible, give meaning to "every word and provision so that no word or provision is rendered superfluous." *Id.* (quoting *Nicaise v. Sundaram*, 245 Ariz. 566, ¶ 11 (2019)). And we "strive to construe a statute and its subsections as a consistent and harmonious whole." *Id.* (quoting *Hoffman v. Chandler*, 231 Ariz. 362, ¶ 7 (2013)).

¶18     We will not read into a statute something that is "not within the manifest intention of the legislature as gathered from the statute itself." *Roberts v. State*, 253 Ariz. 259, ¶ 20 (2022). Nor will we "inflate, expand, stretch or extend a statute to matters not falling within its expressed provisions." *Id.* (quoting *City of Phoenix v. Donofrio*, 99 Ariz. 130, 133 (1965)). Only if the text "yields different reasonable meanings" may we employ "secondary interpretation methods, such as the statute's subject matter, historical background, effect and consequences, and spirit and purpose." *Rosas*, 249 Ariz. 26, ¶ 13.

¶19     Chapter 4.2 on Historic Preservation, in which the relevant statutes appear, contains no definition of "agency." When a statute does not define a term, we may consider dictionary definitions. *Shepherd v. Costco Wholesale Corp.*, 250 Ariz. 511, ¶ 20 (2021). But the dictionary definitions provide little clarity here, and we thus turn to other aspects of the statutory scheme and indicators of the legislature's purpose.[2]

¶20     During the same legislative session in 1982 in which it enacted the historic preservation statutes in question, our legislature elsewhere defined "agency" to include political subdivisions for purposes of at least one specific, unrelated article. 1982 Ariz. Sess. Laws, ch. 156, § 4 (historic preservation provisions) & ch. 160, § 1 (regarding contracts in restraint of trade or commerce). That it declined to do so in the context of Chapter 4.2 is meaningful: the very legislators who enacted the statutes in question knew how to define "agency" to include political subdivisions when they so desired, and they did not do so in the context of the new historic preservation statutes.

---

[2]PCC cites a definition of "state agency" from the 2024 edition of Black's Law Dictionary. But the edition in effect at the time the statutes were enacted in 1982 contained no such definition. *See* Black's Law Dictionary (5th ed. 1979); *see also Matthews v. Indus. Comm'n of Ariz.*, 254 Ariz. 157, ¶ 33 (2022) (relevant dictionary definitions are "from the time the provision was adopted"). The prior version had defined "governmental agency" as: "A subordinate creature of the sovereign created to carry out a governmental function. *Frequently, a political subdivision* or corporation." *Governmental Agency*, Black's Law Dictionary (4th ed. 1968) (emphasis added). However, by the fifth edition, the second clause had been deleted from the definition. *Governmental Agency*, Black's Law Dictionary (5th ed. 1979).

¶21        Indeed, in the historic preservation statutes and a range of other unrelated statutory enactments and amendments adopted in 1982, the legislature repeatedly treated "state agencies" as distinct from "political subdivisions." *See* 1982 Ariz. Sess. Laws, ch. 121, § 1 (regarding grants of rights-of-way "to governmental agencies or political subdivisions of this state"), ch. 156, § 3 (repeatedly adding language regarding "federal and state agencies, political subdivisions of this state and other persons" in historic preservation statutes), ch. 250, § 1 (adding language regarding release of confidential information to "agencies of the federal government, this state or any political subdivision of this state"), ch. 251, § 7 (repeatedly adding language regarding "state regulatory agency and political subdivisions" regarding fees for criminal fingerprint processing), ch. 336, § 3 (enacting new chapter on solid waste management, including language regarding grants from, *inter alia*, "any political subdivision of this state [or] any agency or branch of the . . . state government").[3]

¶22        Although these unrelated statutes do not answer whether an "agency" is distinct from a "political subdivision" in the statutory scheme at issue, they illustrate that treating them as distinct would not be an aberration or result in absurdity. More importantly, the legislative findings that introduce the statutes at issue point toward treating them in this manner. The full language exhorts "this state" to cooperate not only "with the political subdivisions of this state," but also "federal agencies, Indian tribes and other persons" in the historic preservation activities outlined. 1982 Ariz. Sess. Laws, ch. 156, § 1. This phrasing suggests that "political subdivisions of this state"—like federal agencies, Indian tribes, and "other persons"—are distinct from the state and its own agencies for the purposes

---

[3]The parties cite a range of other statutes, some defining "agency" to include political subdivisions and others expressly excluding political subdivisions from the definition of "agency." *See* A.R.S. §§ 41-1001(1), 41-1080(F)(1), 41-1371(2), 41-2771(7). None of these statutes appear in the chapter or articles in question here or otherwise apply to the historic preservation statutes that are the subject of this special action. In addition, they are limited by chapter or section, as well as by context. And none of the cited statutes were enacted at the same time as the statutes before us. Thus, none of the various statutes are dispositive, as they demonstrate that the legislature is capable of both including and excluding political subdivisions from the definition of "agency" when it deems necessary, neither of which occurred here.

of the statutes that follow.  This supports the superior court's conclusion that, although "the drafters of the statute hoped there would be cooperation between state agencies and those other entities," §§ 41-861 through 41-864 do not apply to them.  At any rate, those sections could not lawfully apply to federal agencies or Indian tribes.  They were therefore not contemplated to apply to political subdivisions of Arizona, which occupy the same list.

¶23        Petitioners respond that federal agencies and Indian tribes "do not . . . hold 'state' property as referenced in the statutes because they are sovereign entities."  They plausibly contend that, by contrast, the property PCC and other political subdivisions hold is a species of state property.  But, nowhere do §§ 41-861 through 41-864 refer to "state" property.  They refer only to "historic properties which are owned or controlled by the agency," § 41-861—"properties that are under the agency's ownership or control," § 41-862.

¶24        We are also instructed by the language appearing in several subsections of A.R.S. § 41-511.04, provisions that were enacted in the same bill and are part of the same statutory scheme.  *See* 1982 Ariz. Sess. Laws, ch. 156, § 3.  Subsection 41-511.04(D)(1) requires the SHPO to "direct and conduct a comprehensive statewide survey of historic properties . . . and maintain inventories of historic properties," all "[i]n cooperation with federal and state agencies, political subdivisions of this state and other persons."  Similarly, § 41-511.04(A)(8) directs the State Parks Board to "[a]dvise, assist and cooperate with federal and state agencies, political subdivisions of this state and other persons in identifying and preserving properties of historic . . . significance."  Both provisions expressly itemize political subdivisions as entities distinct from state agencies.

¶25        As Petitioners emphasize, § 41-511.04(D)(4) arguably imposes obligations beyond mere cooperation.  It directs the SHPO to affirmatively engage with political subdivisions "at all levels of planning and development" and contemplates that political divisions have "historic preservation responsibilities."[4]  But, by its terms, it imposes no concrete

---

[4]In full, § 41-511.04(D)(4) directs the SHPO to:

> Advise, assist and monitor, as appropriate, federal and state agencies and political subdivisions of this state in carrying out their historic preservation

statutory duties on political subdivisions, declines to further define what those responsibilities might be, and again refers to political subdivisions as something distinct from state agencies. *See* § 41-511.04(D)(4). Petitioners nonetheless contend the foregoing language evinces a legislative intent to "bind political subdivisions" under Arizona's historic preservation laws. But Arizona's laws cannot bind federal agencies, which are treated equivalently with political subdivisions in the language of the statute.

¶26 Petitioners contend that, "in order for political subdivisions to bear and carry out historic preservation responsibilities, Arizona's historic preservation laws must apply to those political subdivisions as the legislature clearly intended." It does not follow, however, that all such responsibilities necessarily stem from the Arizona historic preservation statutes in question here or that political subdivisions must be bound by the agency-specific language of §§ 41-861 through 41-864.

¶27 Notably, the term "political subdivision" includes, *inter alia*, cities, towns, and counties. *See, e.g.*, A.R.S. §§ 9-581(2), 28-7681(6), 38-382(3), 38-431(5). Other statutes enacted by our legislature create separate historic preservation responsibilities for such bodies. For instance, A.R.S. § 11-268(G) requires county boards of supervisors to consult with the SHPO "[b]efore the removal of a dilapidated building . . . to determine if the building is of historical value." And A.R.S. § 41-844(A) requires "[a] person in charge of any survey, excavation, construction or other like activity on any lands owned or controlled . . . by any county or municipal corporation within the state" to "report promptly" to a state official the existence of any historical site or object that is at least fifty years old discovered in the course of such work and to "immediately take all reasonable steps to secure and maintain its preservation." *See also* A.R.S. § 11-254.05(A), (B)(4) (authorizing county boards of supervisors to purchase or lease the development rights of private land in county with money from public or

responsibilities and cooperate with federal and state agencies, political subdivisions of this state and other persons to ensure that historic properties and historic private burial sites and historic private cemeteries are taken into consideration at all levels of planning and development.

private sources, including for the purpose of preserving historic properties).

**¶28** A political subdivision's historic preservation responsibilities may also arise from other sources, including its own official acts. *See Exodyne Props., Inc. v. City of Phoenix*, 165 Ariz. 373, 377-78 (App. 1990) (interpreting and applying city's historic preservation ordinance, which gave rise to various legal rights). Indeed, as Petitioners noted at the hearing on the motion for a preliminary injunction, the Pima County Board of Supervisors has adopted historic preservation rules and regulations.[5] *See* Pima Cnty., Ariz., Policy No. C3.17 on Protection of Cultural Resources (Dec. 6, 1956); Pima Cnty., Ariz., Resolution No. 1983-104 on Cultural Resource Protection (May 24, 1983); Pima Cnty., Ariz., Code Ordinances ch. 18.63 Historic Zone (1972, 1985). These instruments give rise to various obligations, including county consultation with the SHPO. *See* Policy No. C3.17, 2. And, as PCC explained to the superior court, political subdivisions like the City of Tucson and PCC have elected boards, which provide "separate ways for the public to make sure that the concerns of historical groups are heard and recognized."

**¶29** This panoply of statutes, local regulations, and voter input not only provide political subdivisions with a host of concrete "historic preservation responsibilities," § 41-511.04(D)(4); those responsibilities are arguably greater than those set forth exclusively for state agencies in §§ 41-861 through 41-864. Thus, our plain language reading of the statute

---

[5] According to the website of Pima County's Division of Cultural Resources and Heritage Preservation, in 2012, the SHPO reviewed Pima County's Historic Preservation program and designated Pima County a Certified Local Government in Historic Preservation. This permits the division "to participate as a local government partner in a nationwide program of financial and technical assistance established by the National Historic Preservation Act of 1966 and administered in Arizona by the Arizona State Parks Board." *Who We Are & What We Do*, Pima Cnty. Div. of Cultural Res. & Heritage Pres., https://www.pima.gov/698/Who-We-Are-What-We-Do (last visited Mar. 11, 2025). The City of Tucson has also been a certified local government for historic preservation purposes since 1990. *Historic Preservation*, City of Tucson, https://www. tucsonaz.gov/ Departments/Planning-Development-Services/Historic-Preservation (last visited Mar. 11, 2025).

would neither undermine the legislature's express purpose in enacting Arizona's historic preservation laws—to comprehensively address the loss and degradation of historic properties across the state—nor create a gap in the overall historic preservation scheme. *See* 1982 Ariz. Sess. Laws, ch. 156, § 1. For the same reason, the exclusion of political subdivisions from the particular "agency"-specific historic preservation responsibilities outlined in §§ 41-861 through 41-864 does not lead to absurd results.

¶30 Furthermore, the requirements of § 41-862 could not practically be applied to political subdivisions. That provision requires the SHPO to "include the performance of state agencies in initiating and satisfying the programmatic management of historic properties in the annual report to the legislature and the governor as provided in [A.R.S.] § 41-151.20." That statute, in turn, requires the SHPO—a position appointed by the governor, A.R.S. § 41-511.02(B)—to submit an annual report to the governor, the president of the senate, the speaker of the house of representatives, and the director of the state library. § 41-151.20(D); *see also* A.R.S. § 41-151(1). In addition to the "performance of state agencies" discussed in § 41-862, the SHPO's report must include "the activities of the historic property rehabilitation grants program" established at A.R.S. § 41-881, which is administered by the State Parks Board through the SHPO. *See* §§ 41-151.20(D), 41-881(A), (E).

¶31 Notably, the governor, as the state's chief executive officer, and the legislature, as the ultimate arbiter of state funding allocations, are legally empowered to take appropriate administrative or fiscal action against a delinquent state agency based on such a report from the SHPO. That scheme cannot reflect an intention to include political subdivisions, which—unlike state agencies—are not answerable to the governor. For its part, PCC is self-governed by a locally elected board.[6] A.R.S. §§ 15-1441, 15-1442; *see also McClanahan*, 25 Ariz. App. at 16 (one attribute "generally regarded as distinctive of a political subdivision" is "that it possesses authority for subordinate self-government by officers selected by it"). And PCC receives funding from a variety of sources, including state and federal grants, student-paid tuition, and property taxes—not just legislative appropriations that would render it wholly answerable to the legislature.

---

[6] *See Governing Board*, Pima Cmty. Coll., https://www.pima.edu/about-pima/leadership-policies/governing-board/index.html (last visited Mar. 11, 2025).

*See* A.R.S. §§ 15-1444(B)(8) (power to accept grants and donations), 15-1445(3) (tuition), 42-17151 (authority to levy taxes on property in county).

¶32            Thus, the legislature appears to have crafted a scheme that recognizes the autonomous nature of political subdivisions as compared to state agencies. PCC's board members, like the elected officials of other political subdivisions, are accountable to the community that elects them. By contrast, the public has no way of so directly holding the SHPO, a governor-appointed official, accountable for his or her actions. Notably, under the state's open-meeting laws applicable to political subdivisions, PCC's elected board must hold meetings that are open to the public and memorialized in publicly available minutes or recordings, with advance notice of what PCC plans to discuss and what it must decide at such meetings posted publicly. A.R.S. §§ 38-431, 38-431.01, 38-431.02. This provides many avenues for the public to monitor and influence PCC's decision-making process in ways that are not available to the public for monitoring or influencing the actions of state agencies.

¶33            The interpretation advanced by PCC and adopted by the superior court is confirmed by guidelines prepared by the SHPO, which has interpreted §§ 41-861 through 41-864 as governing only state agencies, not political subdivisions. *See* Ariz. State Historic Pres. Off., Guidelines for the State Historic Preservation Act (Jan. 18, 2001) (as approved by the State Parks Board).[7] Indeed, as PCC points out, those guidelines—which were developed by the SHPO "with input from state agencies, advisory committees and commissions, tribal preservation offices and preservation professionals," were subject to review, comment, and resulting modification, and were approved by the Arizona State Parks Board in January 2001—clarify that "Agency does not include political subdivisions of this state or any of the administrative units of a political subdivision, but it does include any board, commission, department, officer or other administrative unit created or appointed by joint or concerted action of an agency and one or more political subdivisions of this state or any of its units." *Id.* at 1, 23.

---

[7]These guidelines are available at https://arizona-content.usedirect.com/storage/gallery/pdf/SHPO_Guidelines_SHPA.pdf (last visited Mar. 11, 2025).

¶34          In sum, the plain language of the historic preservation statutes in question, in its overall statutory context, establishes that our legislature did not bind political subdivisions when establishing the responsibilities of "agencies" or the related duties of the SHPO for historic preservation on land owned or controlled by state agencies.    This interpretation gives meaning to every word and provision, and it leads to no inconsistent or absurd results.  Although we need not employ secondary interpretation methods, legislative findings from the time of the statutes' enactment and the SHPO's more recent interpretation of those statutes confirm this result.  Because we conclude that §§ 41-861 through 41-864 do not apply to PCC, we further conclude that Petitioners cannot establish either a strong likelihood of success on the merits or that irreparable harm will result if a stay is not granted.  *See Smith*, 212 Ariz. 407, ¶¶ 9-10.  Thus, the superior court did not abuse its discretion in denying Petitioners' request for a stay pending appeal or the underlying request for a preliminary injunction, the denial of which is the subject of that appeal.

**Disposition**

¶35          We accept special-action jurisdiction but deny relief.